# CIRCUIT COURT OF THE CITY OF RICHMOND

Richmond Ambulance Authority

v.

HealthKeepers, Inc., etc.

## Case No. LL-748-1

BY JUDGE MELVIN R. HUGHES, JR.

## May 9, 2001

This case is before the court on the parties' cross-motions for partial summary judgment. The parties have stipulated to certain facts and documents they believe are sufficient for a decision on the motions. As a result, they have framed a series of issues which they submit for decision. The court agrees that the facts are sufficiently adequate for partial summary judgment disposition. What follows is a summary of the salient facts.

*Factual Background*

Plaintiff, Richmond Ambulance Authority (RAA), is a public authority created by the Virginia General Assembly under 1991 Acts of Assembly, ch. 431, and organized by the City of Richmond. RAA provides emergency ambulance services within the City of Richmond and is the only authorized provider of such services. Defendant HealthKeepers is a licensed health maintenance organization.

In 1992, RAA and HealthKeepers entered into an Ambulance Services Agreement (the Agreement) whereby RAA agreed to provide ambulance services to HealthKeepers' enrollees and HealthKeepers in turn agreed to pay for such services. A schedule of fees was attached to the contract, which has been subsequently updated. The parties refer to these rates as the commercial or retail rates.

In April 1999, HealthKeepers entered into a contract with the Virginia Department of Medical Assistance Services (DMAS) to provide managed care services as an HMO to certain Medicaid-eligible persons. Not all Medicaid-eligible individuals are enrolled in HealthKeepers or in a similar HMO. Pursuant to various Transportation Provider Participation Agreements entered into between RAA and DMAS, DMAS pays RAA directly for services provided to individuals not enrolled in an HMO.

In April 1999, when HealthKeepers began providing managed care services to Medicaid-eligible individuals, it unilaterally began paying RAA for services rendered to such individuals at the rates established by DMAS rather than at the rates set forth in the Ambulance Agreement. The DMAS rates are significantly lower than the rates set out in the Ambulance Agreement.

The RAA-HealthKeepers' contract ended March 1, 2001. The parties have stipulated that effective that date that RAA intends to bill HealthKeepers at a rate equivalent to RAA's retail rates for services rendered to both Medicaid-eligible and non-Medicaid enrollees of HealthKeepers. The parties further stipulate that effective March 1, 2001, HealthKeepers will pay RAA the DMAS rates, not the retail rates, for services rendered to its Medicaid-eligible enrollees.

RAA filed the instant motion for judgment which sets out five counts. RAA's Motion for Judgment consists of Count I: Breach of Contract; Count II: Breach of Richmond Ambulance Authority Act; Count III: Breach of Va. Code § 38.2-3407.15; Count IV: Breach of Va. Code § 38.2-3407.15 — Treble Damages; and Count V: Declaratory Judgment. It seeks payment for services provided to HealthKeepers' Medicaid-eligible enrollees according to the rates set out in the Ambulance Services Agreement. It also claims that HealthKeepers has violated Va. Code § 38.2-3407.15 regarding ethics and fairness in carrier business practices (the Ethics and Fairness Act), a statute which among other things sets standards for the processing and payment of claims for health care services by carriers. HealthKeepers counterclaims alleging, *inter alia*, that some of the services RAA provides to Medicaid-eligible person were not medically necessary.

HealthKeepers' Counterclaim contains the following counts; Count I: Breach of Contract; Count II: Unjust Enrichment; Count III: Actual and Constructive Fraud; Count IV: Conversion; Count V: Injunction Against Continued Misconduct and Specific Performances; and Count VI: Declaration Regarding HealthKeepers' Withholding of Payments — Injunctive Relief.

The court will address the issues as framed.

*Under the Ambulance Services Agreement and as to Medicaid-Eligible Enrollees, May HealthKeepers Limit Its Payment to RAA to the DMAS Rates?*

HealthKeepers maintains that, even though the Ambulance Agreement establishes rates, it is not obligated to pay those rates because the Agreement never contemplated Medicaid patients. It asserts that Medicaid-eligible enrollees are different from commercial enrollees because Medicaid-eligible enrollees are subject to a government program in which DMAS makes the rules and sets the rates.

HealthKeepers also relies upon a form called the HCFA-1500, which it requires RAA to submit for payment. HealthKeepers requires these forms regardless of whether the claim is for services rendered to Medicaid-eligible enrollees or commercial enrollees. The form states in part, "I agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program." HealthKeepers contends that, because the persons at issue are Medicaid patients, it stands in the shoes of DMAS and that such certification means that RAA agreed to accept DMAS rates for HealthKeepers' Medicaid patients.

The court finds that HealthKeepers cannot unilaterally pay the lower DMAS rates because such payment would contravene the rate schedule the parties agreed upon in 1992 and as later updated. The parties agree that, despite an attempt by HealthKeepers to amend the Agreement, no amendment or termination of the Agreement occurred until HealthKeepers advised in November 2000 that the Agreement would terminate in March 2001. The Agreement sets out rules respecting amendments to the Agreement. There are notice provisions which HealthKeepers did not follow, and thus the Agreement cannot be deemed changed on the question of rate structure. And though HealthKeepers admits that it was not successful in an attempt to amend the contract, there is nothing to suggest that the parties' 1992 Agreement as updated was not a global arrangement whereby the parties agreed to rates covering the services to be rendered thereunder. There is no obligation borne of contract which requires RAA to accept DMAS rates. And lastly, the language on the HCFA-1500 form is not relevant to the situation, as RAA urges. HealthKeepers is not a Medicaid program but rather is a for-profit corporation.

*After March 1, 2001, When the Ambulance Agreement Terminates, Can HealthKeepers Limit Its Payment to the DMAS Rates?*

The parties agree that, following termination of the Ambulance Agreement, quantum meruit is the determinant as to the amount of compensation due from HealthKeepers.

Under the enabling legislation which created RAA, the Virginia General Assembly not only gave RAA the power to set its own rates but also forbade other agencies from interfering with those rates. Section 7 of the Richmond Ambulance Authority Act provides: "such rates shall not be subject to supervision or regulation by any bureau, board, commission, or other agency of the Commonwealth or of any political subdivision." The court finds that this legislative pronouncement is most telling on the question of rates and rate reduction in the case. Correspondingly, HealthKeepers, as an HMO, is required by law to provide to its enrollees emergency health care services including medically necessary ambulance services. See Va. Code § 38.2-4312.3. As previously noted, the General Assembly has made RAA the only provider of such services in the City of Richmond.

So, as noted, the question is the value of services for payment under quantum meruit. While agreeing that the value of the services is to be determined by quantum meruit, the parties disagree on how to measure the value of those services.

HealthKeepers argues that quantum meruit is measured by the reasonable value of services. To find reasonable value, one needs to examine what others in the marketplace pay for the same services. In this context, HealthKeepers defines the marketplace as the Medicaid market. Thus, HealthKeepers claims DMAS rates are the reasonable value of services.

RAA observes that in the context of a regulated utility, which it asserts is close to its position here, the rates which it is charged by the Legislature to set should be the measure for reasonable value of services.

The only case the court has been cited to and can find on the subject of a public agency and compensation due on the basis of quantum meruit is *Po River Water and Sewer Co. v. Indian Acres Club*, 255 Va. 108, 495 S.E.2d 478 (1998). There, the court approved the amount due for water service provided by a water utility as the rate set by the State Corporation Commission for the service. And while the court agrees with HealthKeepers that *quantum meruit* does not allow a selling party to use its own charges only as the proper measure of fair value to the buying party, the Supreme Court seems to have made a distinction when rate making by a public utility is involved.

Accordingly, the court will agree with RAA that the rates it sets are the proper measure for a quantum meruit determination of rates after March 1, 2001.

*What Is HealthKeepers' Obligation under the 1992 Agreement for Services Rendered to HealthKeepers' Medicaid Enrollees Which Were Not Medically Necessary?*

Under the Agreement, the parties agreed that HealthKeepers would pay for "covered services." Covered services is defined by the contract as "those medical and hospital services and benefits to which members are entitled under the terms of HMO's group or individual member service agreements, copies of which shall be made available to the Authority by HMO upon the latter's request." The contract between HealthKeepers and DMAS and the materials given to enrollees explaining their coverage all exclude from coverage services that are not medically necessary. Thus, HealthKeepers contends, it is only required to pay for services that are medically necessary. The court does not agree with HealthKeepers.

The language of the parties' contract, the covered services provision, makes no link to a determination of medical necessity. Based on the contract and the words the parties chose to govern their affairs, the court cannot include a provision tying payment to medical necessity at the urging of one of them.

For the same reason, HealthKeepers has no right to reevaluate claims on the basis of medical necessity. There is no provision in the Agreement for adjusting claims already paid on the basis of any post-medical necessity evaluation.

*After March 1, 2001, Does HealthKeepers Have an Obligation to Pay RAA for Services Rendered to Medicaid-Eligible Enrollees When the Services Are Not Medically Necessary?*

Consistent with the parties' agreement, the court has made a finding in RAA's favor that following March 1, 2001, the parties will operate under quantum meruit as a basis for determining the value of services that RAA will render. HealthKeepers has asserted that, it should not have to pay for any such services in the future, that is, after the contract termination, which are not medically necessary.

Of course, as before, there is no contract in place specifying that the parties' rights and obligations are conditioned on medical necessity. Indeed, there is no specification in the General Assembly's command to RAA to

include or consider medical necessity in its rate structure, just that RAA set its rates in consideration of other terms and conditions. Considering too that quantum meruit is based here on the value of the service rendered, without consideration of the factor of medical necessity, the court finds that, if and when RAA provides its services, it should be compensated on a quantum meruit basis without regard to medical necessity.

*Does the Ethics and Fairness Act Apply to HealthKeepers' Processing and Payment of Claims for Ambulance Services Rendered to HealthKeepers' Medicaid-Eligible Members?*

Va. Code § 38.2-3407.15, which the statute headnote calls ethics and fairness in carrier business, provides for fair business practice standards applicable to claim reimbursement practices of "carriers." The Act defines carrier as having the meanings set forth in Va. Code § 38.2-3407.10. That section provides in subsection (3), applicable here, that the term means, "Any health maintenance organization providing health care plans for health care services." The Act defines "health plan" as follows:

> Any individual or group healthcare plan . . . to cover all or a portion of the cost of persons receiving covered health care services, which is subject to state regulation and which is required to be offered, arranged, or issued in the Commonwealth by a carrier licensed under this title. Health plan does not mean (i) coverages pursuant to . . . Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq*. or Title XX of the Social Security Act, 42 U.S.C. § 1397 *et seq*. (Medicaid). . . .

At the heart of the parties' dispute on the applicability of the statute is the statute's provision setting time limits to contest paid claims. Va. Code § 38.2-3407.15(B) provides in relevant part:

> 6. No carrier may impose any retroactive denial of a previously paid claim unless the carrier has provided the reason for the retroactive denial and . . . (iii) the time which has elapsed since the date of the payment of the original challenged claim does not exceed the lesser of (a) twelve months or (b) the number of days within which the carrier requires under its provider contract that a claim be submitted by the provider following the date on which a health care service is provided.

The relevant period is 90 days.

HealthKeepers argues that the ethics and fairness statute does not apply because of the exclusion from the definition of "health plan" of coverages issued pursuant to Medicaid. It stresses that the nature of the coverage is determinative and not the nature of the entity. The contract between it and DMAS states that the purpose, through HealthKeepers, is to provide and pay for medical contract services to recipients enrolled in the HMO under the State Plan for Medial Assistance pursuant to Title XIX of the Social Security Act. Furthermore, HealthKeepers notes that enrollees who lose their Medicaid eligibility can no longer be enrolled with the HMO. Alternatively, HealthKeepers argues that, even if the statute regulates it as a whole, then the time limit does not apply to situations as here where adjustments are sought through a counterclaim.

RAA argues that the statute applies to HealthKeepers because HealthKeepers fits within the definition of "carrier." Continuing, RAA contends that HealthKeepers is not excluded for several reasons: (1) HealthKeepers is not a Medicaid program and it does not administer or operate a Medicaid program; (2) the coverage was issued pursuant to a contract with DMAS and not pursuant to Title XIX; and (3) the contract between DMAS and HealthKeepers reiterates that HealthKeepers is a separate legal entity from DMAS.

The court agrees with RAA's assessment. The Ethics and Fairness Act applies to HealthKeepers because it is a "carrier" that furnishes a "health plan" pursuant to its contract with DMAS. In this case the Ambulance Agreement requires RAA to submit claims to HealthKeepers "within ninety (90) days of the date the service is rendered" and it does not matter that the claim is asserted by way of counterclaim.

For the foregoing reasons, the court awards partial summary judgment to the plaintiff, RAA, and denies partial summary judgment to HealthKeepers.

June 26, 2001

In this case, the defendant has asked the court to reconsider its decision to grant plaintiff's motion for partial summary judgment. A motion to reconsider has been briefed and argued.

Reconsidering, the court agrees with plaintiff. Save for a Virginia Department of Medical Assistance Services (DMAS) memorandum dated March 13, 2001, which became available between the time the parties' cross-motions for partial summary judgment were argued and decided, defendant has offered nothing new to support its position.

While the case was under advisement, defendant advised the court that the DMAS memorandum had become available and urged the court to consider it in support of its position. Plaintiff, on the other hand, did not want the court to consider the memo citing, *inter alia*, the need to conduct discovery. The court advised that it would proceed to a decision on the motions and take up the matter later under a motion to reconsider which, invited, defendant has chosen to do.

However, critically, the memorandum only confirms what the court meant in deciding against defendant in the first place, DMAS can only govern what is paid by a state agency directly to a provider. It cannot as here dictate the level of payment when an HMO, like defendant, pays for services rendered by a provider constituted by the General Assembly like this plaintiff.

The same applies to what defendant has said regarding the court's misunderstanding on the issue of *quantum meruit*. In the May 9 letter decision on the motions, the court said that defendant agreed that *quantum meruit* would be the proper measure to determine compensation due plaintiff after the parties' contract on rates ran out. Defendant points out that it did not agree that *quantum meruit* was the proper standard; rather, it argued the DMAS payment rates should control compensation due plaintiff after the contract. Also, defendant stated various other grounds on why the commercial rates would not be a proper standard should the court agree that *quantum meruit* was the approach to be followed. Again, the court reiterates that DMAS rates cannot control given the authority invested to plaintiff by the Legislature.

As to the foregoing and all the other points raised by defendant in the request for reconsideration, the court accepts as its own all the reasons mentioned by plaintiff in Plaintiff's Brief in Opposition to Defendant's Motion for Reconsideration and denies defendant's motion to reconsider.